## D. J. HOLLAND v. R. H. TOWNSEND, ET AL.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS
NO. 3 OF PHILADELPHIA COUNTY.

Argued April 3, 1890—Decided October 6, 1890.
[To be reported.]

1. Under § 1, act of March 21, 1772, 1 Sm. L. 370, authorizing the sale of
a distress for rent " after six days' public notice," it is not essential to
the legality of the proceeding that the sale take place on the day fixed
by the notice.   As an incident to the power to sell, the bailiff has power
to make a reasonable adjournment of the sale.
2. An adjournment for one week is a reasonable delay, and will not of
itself convert a lawful distress into a trespass; nor is it necessary, in an
action of trespass for a sale made after such adjournment, that the
cause of the adjournment should affirmatively appear: Ricketts v.
Unangst, 15 Pa. 90, and Quinn v. Wallace, 6 Wh. 452, explained.
3. A landlord has the right to impound a distress upon the premises for a
reasonable time after the expiration of the five days allowed to the ten-
ant by the act of 1772 for bringing replevin, which, ordinarily, will be
until the day of sale in due course; and he may take exclusive posses-
sion of that part of the premises in which the distress is impounded.
4. The fact that the landlord, after making a distress on his tenants' goods,
visited a sub-tenant of a part of the premises, cautioned him to pay no
more rent to the mesne tenant, and offered to execute a new lease di-
rectly to the sub-tenant for the part of the premises occupied by him,
would have no effect upon the legality of the distress.

Before STERRETT, GREEN, CLARK, McCOLLUM and MITCH-
ELL, JJ.

No. 159 January Term 1890, Sup. Ct.; court below, No. 956
June Term 1887, C. P. No. 3.

On September 3, 1887, Dennis J. Holland brought trespass
against Richard H. Townsend and Mary S. Townsend, his
wife, trustees, to recover damages for an alleged illegal distress
and sale of goods of the plaintiff, and for an alleged eviction
of the plaintiff from premises demised to him by the defend-
ants.   Issue.

By agreement of the parties, the cause was submitted to the
decision of *Mr. George Peirce*, as referee under the act of
May 14, 1874, P. L. 166, who subsequently filed a report
making the following

Referee's Report.

### FINDINGS OF FACT.

On December 20, 1886, the defendants executed and delivered to the plaintiff a lease for premises No. 630 Market street, for the term of three years from January 1, 1887, at the rent of $3,000 per annum, payable in monthly instalments, in advance, the first monthly instalment to be paid January 1, 1887. The demised premises, by the terms of the lease, were to be used by the plaintiff as a liquor store, and it was provided that all necessary repairs and renewals should be made by the plaintiff at his own expense.

At the time of the execution of the lease the Nonantum Worsted Co. occupied all the demised premises above the first floor. Dr. Townsend, one of the defendants, recommended said company to the plaintiff as tenants, and consented that he should sub-let said upper portion of the premises to them, which he accordingly did for the term of one year from January 1, 1887, at the yearly rent of $1,000, payable in equal monthly instalments in advance.

The plaintiff went into possession January 1, 1887, and immediately proceeded to make extensive repairs, alterations and improvements on the first floor, and fit the same up as a handsome drinking saloon. This occupied nearly one month, so that he did not begin to transact business in said premises until the latter part of January, 1887. In fitting up the saloon, the plaintiff expended for fixtures, etc., the sum of $1,799.59; and for signs, awnings, furniture, a bar pump and fittings, and cigars, the sum of $319. In addition, the plaintiff purchased liquors, glassware, and other articles necessary to the prosecution of his business, and the value of such portion thereof as remained on hand on August 31, 1887, was $152.80.

On August 1, 1887, the plaintiff was indebted to the defendants, under the lease between them, in the sum of $416.67, being composed of $116.67, balance of rent due July 1st, in advance, and $250, one month's rent due August 1st, in advance. On August 10, 1887, the defendants, by their bailiff, R. D. Thompson, levied a distress upon all the personal property of the plaintiff upon the demised premises, for the recovery of said sum due for rent, and costs amounting to $32.07.

Up to the eighteenth day of August no further action was taken by the defendants, or their bailiff, with relation to the

distress, except that during the last three days a watchman was stationed by the bailiff to watch the distress. This delay was at the request of the plaintiff, in order that he might have afforded him an opportunity to raise the amount of money due. He did not succeed in raising any money outside of the receipts from sales made in the usual course of his business, but out of these he paid to the bailiff the sum of $13 on account of rent due.

On August 16, 1887, the plaintiff waived his right to an appraisement. On the morning of August 18, 1887, Lewis F. List, deputy constable for R. D. Thompson, the bailiff, went to the demised premises and there saw the plaintiff, and told him that he had been ordered by the defendants to close the place up, and demanded the keys of the said premises of the plaintiff.* The plaintiff then and there surrendered the keys

---

* Upon this point, the following testimony was given before the referee. The plaintiff testified: " On the morning of the 18th, I came down to the store between nine and ten o'clock in the morning. As I walked in, I found the bar-tender there and Mr. List, the deputy constable, and two friends of his. He said, 'You have got to leave the place.' I said, 'How is that?' He said, 'Yes, you have to leave the place, and I must get the keys and close this place up.' I said, 'That is strange, who ordered this?' He said, 'The landlord ordered the place closed up.' So I walked out, and he followed me out. He demanded from me the key. I gave him the key. He went out and locked the front door, put a bill up and came back. I said to him, 'Will you allow me time to get some papers and some little matters I have here?' He said, 'Oh, yes; I will allow you that time certainly.' So I picked up some little papers I had, one thing and another and came out. He let me and Mr. Slimmer out the back way, and took the keys from the bar-keeper and let us out the back way. . . . That morning when the constable came, was the first time I knew that they were going to put me out. I did not tell him that I was ready to give up the possession and he could have the keys. When he demanded my keys and I had to give them to him, I supposed I was in the hands of the constable and I would be put out any way, and I showed him how to lock up. I supposed the constable would put me out. When he locked up the place I had nothing further to do; I gave up all hopes then."

Lewis F. List, the deputy of the constable who made the distress, after describing an arrangement entered into at the plaintiff's request, under which the plaintiff was to be given time to enable him to make efforts to raise money, he paying over, on account of the rent due, the receipts of each day from his business, testified further for the defendants: " The receipts were only—one day it was $5, and the next day $4, and the next day $4; there were $13 in four days' receipts, which he was credited for.

of the premises to the deputy constable, who, having directed the plaintiff and all other parties present to leave the saloon, and seen them out, locked it up, leaving therein all property which had been levied upon, and posted bills on the premises advertising a sale, in pursuance of the levy and distress, to take place on August 24, 1887, and carried the keys of the premises away with him. The action of the bailiff in demanding and receiving the keys and locking the place up was in consequence of and in conformity with directions received from the defendants.

On August 24, 1887, the bailiff, without notice to the plaintiff and without his knowledge, postponed the sale until August 31, 1887, at which last mentioned time the sale actually took place. No cause is alleged, or reason given, in the testimony before the referee, for this postponement.

Subsequent to the advertisement of the constable's sale, but prior to the sale, Dr. Townsend, one of the defendants, called upon Mr. Harlan, agent for the Nonantum Worsted Co., who was in charge of the company's place of business at No. 630 Market street, and told him that the company's goods on the premises were liable for the rent which the plaintiff had collected from him and failed to pay over to the defendants, and also for the rent due for down-stairs. He further, at this time, cautioned Mr. Harlan against paying any more rent to the plaintiff, and offered to give the company a new lease, to be executed by the defendants directly to the company.

On August 31st, the constable proceeded with the sale, by which he realized the sum of $473.70. This sum the constable distributed as follows : To the defendants, amount of rent due, less the $13 already paid, $403.67 ; to costs of levy, watchman, advertisements, and sale, $49.32; and to the plaintiff's bartender two weeks' wages, paid at the request of the plaintiff, $20 ; which left a balance due the plaintiff of 71 cents.

Then, after that, I was ordered to see him, and to state that it would be better for him to save the watchman's expenses and to close the place, and to give me the key, as the result was unsatisfactory, the amount of receipts from the day's sales. He said, 'If you want the keys, you can have the keys and close up ; ' and he went and got the keys and gave me the keys, and showed me the key to the front door and the key to the back door. I finally closed the place up and took the watchman off, and saved the watchman's expense."

Referee's Report.

The referee finds the value, at the time of the sale, of the property of the plaintiff on the demised premises, sold by the constable, measured by what it cost to procure the same and put it in place, to be $900.23.

At the conclusion of the sale on August 31st, the bailiff locked up the demised premises, except that portion occupied by the Nonantum Worsted Co., and, with the knowledge of Dr. Townsend, handed the keys thereof to defendant's attorney, who received them. On the same day, August 31, 1887, the sheriff, under and by virtue of two writs of fieri facias, issued out of the Court of Common Pleas, levied upon the remainder of plaintiff's property upon the demised premises, and sold the same September 9, 1887, for the sum of $122.50. At said sheriff's sale, the unexpired term of plaintiff in the lease from defendants to him was sold for $1 to one James Walker, who purchased as the agent of defendants, and who, September 14, 1887, assigned said unexpired term to them. The plaintiff, since August 18, 1887, when he was expelled from the demised premises by the bailiff, has not occupied the same.

On September 5, 1887, there was left upon the demised premises a notice signed by the defendants, per their attorney, directed to the plaintiff, notifying him that in consequence of his failure to pay the rent of the demised premises, in accordance with the provisions of the aforesaid lease to him, the defendants intended to determine the said lease under the power given to them therein, and that, at the expiration of ten days from the date when the notice was left, September 5th, the said lease would absolutely determine; and further notifying the plaintiff to remove from and deliver up possession of said premises at the end of the ten days, to wit: on September 16, 1887.

Upon consideration of the cause, the points submitted and the arguments of counsel, the referee has arrived at and states as applicable to the facts the following

### CONCLUSIONS OF LAW.

1. In the state of Pennsylvania, a landlord, when dealing with his tenant's goods under a distress, is held strictly to the exact terms of the act of assembly regulating such proceedings: Murphy v. Chase, 103 Pa. 260; Kerr v. Sharp, 14 S. & R. 402; McElroy v. Dice, 17 Pa. 168; Brisben v. Wilson, 60 Pa. 452.

Referee's Report.

2. The act of the bailiff is the act of the landlord, and any act of his, at variance with the provisions of the statute, is the landlord's act as well as his: Kerr v. Sharp, supra; McElroy v. Dice, supra; Brisben v. Wilson, supra; Wells v. Hornish, 3 P. & W. 33.

3. Although the rent may be due, and the distress lawfully made in the first instance, yet the bailiff may afterwards commit an act in itself a trespass, and, thereby, both he and the landlord would be deemed trespassers ab initio: Richards v. McGrath, 100 Pa. 399.

4. Any act of the landlord which deprives the tenant of the beneficial enjoyment of the premises to which he is entitled under the lease, will amount to an eviction and suspend the rent: Hoeveler v. Fleming, 91 Pa. 325.

5. If, in consequence of the wrongful acts of the lessor upon the demised premises, depriving him of the beneficial enjoyment thereof, the lessee abandons the premises, it is an eviction; and the intent to evict may be presumed: Skaley v. Shute, 132 Mass. 367 ; Leadbeater v. Roth, 25 Ill. 480.

6. By the terms of the act of March 21, 1772, § 1, the landlord, having made the appraisement, is obliged, "after six days' public notice," to sell the goods and chattels distrained. The landlord has no discretionary power as to the time when he shall sell the distress. The act was made for the benefit of the tenant as well as that of the landlord, and it is the right of the former to have the goods sold as early as the directions of the act will admit. It was clearly the intention of the legislature that the landlord should have no discretion to avoid the sale at the expiration of the six days' notice, unless by the consent of the tenant, or prevented from so doing by the payment of the rent or the suing out of a replevin : Quinn v. Wallace, 6 Wh. 452. It is possible that the landlord or bailiff would be justified in postponing the sale, if there were but one bidder present: Ricketts v. Unangst, 15 Pa. 90 ; but this should be affirmatively shown by the landlord, and cannot be presumed by the referee: Murphy v. Chase, supra ; or, the bailiff may postpone the sale at the request of the tenant: Quinn v. Wallace, supra; Wood's L. and T., § 546; Harrison v. Barry, 7 Price 690 ; Fisher v. Algar, 2 C. & P. 374 (12 E. C. L. R.), A failure to sell the distress at the expiration of the six days'

notice, in any other case than those above enumerated, is not in compliance with the act of March 21, 1772, and renders the landlord a trespasser ab initio.

7. The distress, in the case before the referee, was lawfully made in the first instance, and there was no irregularity committed by the bailiff prior to August 18, 1887.

8. [The action of the defendants in visiting the Nonantum Worsted Co. upon the demised premises, before the time of the constable's sale, without the consent of the plaintiff, and cautioning said company not to pay any more rent to the plaintiff, and offering to execute and deliver to said company a new lease for that portion of the demised premises occupied by it, and the action of the bailiff in expelling the plaintiff, demanding and receiving from him the keys thereof and locking the place up, were acts depriving the plaintiff of the beneficial enjoyment of said premises to which he was entitled under the lease, and constituted an eviction of the plaintiff from said premises by the defendants; and this eviction had the effect of suspending the rent for the month of August, 1887, which was the month then "running on:"] [9] Kessler v. McConachy, 1 R. 435; Hoeveler v. Fleming, supra.

9. [In expelling the plaintiff from the demised premises, demanding and receiving from him the keys thereof and locking the place up, the defendants were guilty of trespass, and became trespassers ab initio.] [10]

10. The postponement of the constable's sale from August 24th to August 31st, without the knowledge and consent of the plaintiff was not in conformity with the act of March 21, 1772, and was without authority in law, and constituted the defendants trespassers, and they must be deemed such ab initio.

11. The impounding of the goods, upon the demised premises, from the time of the levy until the time of the sale, was not, of itself, unlawful. Under the usage prevailing in Pennsylvania, the goods may be kept on the premises for a reasonable time after the five days have expired, which, in all ordinary cases, would be until the time arrives at which they are to be sold in due course of law: Waitt v. Ewing, 7 Phila. 195; Woglam v. Cowperthwaite, 2 Dall. 68; [but the postponement of the sale on August 24th being an unlawful act, the further impounding of the goods upon the premises became an act of

trespass on the part of the defendants, and rendered them trespassers ab initio.] [11]

12. [The plaintiff is entitled to be compensated for the fair value of his property lost by the constable's sale, at the time when and place where it was distrained, not merely what it was worth for removal, but what it would have cost to procure articles of like nature and quality and put them in the same place : Fernwood Ass'n v. Jones, 102 Pa. 311.

13. The plaintiff is also entitled to damages for his eviction from the demised premises by the defendants and the breaking up of his business:] [12] Garrett v. Cummins, 2 Phila. 207; Schlitz Brewing Co. v. McCann, 118 Pa. 314; Hoy v. Gronoble, 34 Pa. 9.

14. In estimating the damages for the injury to the plaintiff by breaking up his business, the amount of his profits for the six or seven months during which he transacted business on the demised premises, may be considered, but it cannot be adopted as an absolutely accurate guide or measure in arriving at the result: Schlitz Brewing Co. v. McCann, supra; but should be considered in connection with all the other facts of the case. Nothing should be more carefully avoided than an assessment based upon speculative or conjectural profits.

15. The amount of rent due by the plaintiff to the defendants, at the time of the levy, cannot be defalked by the latter in mitigation of the damages assessed by the referee: Carrier v. Esbaugh, 70 Pa. 243; McMichael v. Mason, 13 Pa. 214; Wilson v. McElroy, 32 Pa. 82.

Upon the closing of the testimony, counsel for the defendants presented the following point, and requested the referee to rule thereon :

1. If the jury find that, after the distraint, the defendants, at the request of the plaintiff, allowed him, for a time, to continue his business under an arrangement for the payment of the rent in instalments, and that the plaintiff afterwards waived the appraisement and agreed that the goods levied might remain on the premises until the rent should be paid, and, if not paid previously, then that the sale thereof might take place on the premises, and that, also at the request of the plaintiff, the defendants allowed him to continue the business for a further time under the supervision of a watchman and the agreement of the

Arguments.

plaintiff daily to pay the receipts of the business to the watchman, and that the last agreement continued until the second day after the waiver of the appraisement, then these facts are a waiver of the strict compliance with all the formalities of a distress prescribed by the law for cases in which the tenant neither waives nor acquiesces in a departing from them, and, even if the subsequent acts of the defendants do amount to a trespass, he is liable only for the actual damage arising therefrom.

Answer: The referee declines to affirm this point. Such a state of facts would constitute a waiver, by the tenant, of the formalities of a distress, only so far as waiving the appraisement and the giving of extra time is involved. Immediately upon the landlord's proceeding, by advertising the sale of the distress, such agreement would be, by his own act, terminated, and he should be, from then on, held to a strict compliance with the terms of the statute, and, in the event of a violation thereof, would be a trespasser, and the estimate of damages for such trespass would be in no way modified or altered by the fact of the agreement referred to.[6]

### JUDGMENT.

The referee finds in favor of the plaintiff against the defendants and assesses damages at sixteen hundred and fifty dollars and twenty-three cents ($1,650.23).

Exceptions to the findings and conclusions of the referee, and his answers to points, were filed in court by the defendants, and by writing filed it was agreed between the parties that they should be treated as if they had been duly filed with the referee, whereupon the referee made a supplemental report overruling the exceptions. The exceptions then being renewed before the court, were dismissed after argument, the report of the referee confirmed, and judgment entered thereon. Thereupon, the defendants took this appeal specifying that the court erred in dismissing the exceptions of the defendants:

6. To the answer of the referee to the defendants' point.[6]

9–12. To the referee's conclusions of law.[9 to 12]

*Mr. John G. Johnson* (with him *Mr. Rudolph M. Schick*), for the appellants:

1. The postponement of the sale from August 24th to Au-

gust 31st, did not make the landlord a trespasser ab initio. The bailiff had power to postpone it, and, in the absence of contrary proof, it must be presumed that his discretion was properly exercised: Ricketts v. Unangst, 15 Pa. 90. The remark in Murphy v. Chase, 103 Pa. 260, that the ordinary presumption of law as to the taking of all the preliminary steps necessary to an official act has no application to a constable acting as the landlord's bailiff, was made in connection with a failure to show a condition precedent to a sale, viz., the advertisement prescribed by the act of March 21, 1772, 1 Sm. L. 370. All the preliminaries to the existence of a power of sale had been complied with in this case. Grant that the words "shall and may," in the act of 1772, are imperative; they are so only as to the duty to sell, and not as to the direction to sell at the end of six days. The object of the direction is simply to secure at least six days' notice. The referee's decision is rested on an erroneous reading of Quinn v. Wallace, 6 Wh. 460.

2. Even if the taking possession of the premises while the goods were under distress was an eviction, such as to suspend the running of rent, it did not render illegal the distress previously made for rent that was in arrear at the date of distress. But it was not an eviction; the landlord had a right to impound the goods upon the premises: McKinney v. Reader, 6 W. 36. And the dealings with the Nonantum Worsted Co. did not amount to an eviction. An unsuccessful offer on September 1st, to give that company a lease, could not be such, nor could a caution as to the company's liability and the risk of its paying rent to the plaintiff. Moreover, the referee should have reported how much damages he allowed for what he found to be an illegal distress, and how much for the eviction he found to have taken place. But, if the sale was legal, as we have endeavored to show, no damages can be allowed on account of the distress, either for the value of the goods or for loss to the plaintiff's business. And in any event the damages were excessive.

*Mr. Edmund Randall* (with him *Mr. James A. Flaherty*), for the appellee:

1. The common law rule, under which any irregularity will vitiate the whole distress and make the distrainer a trespasser

Opinion of the Court.

ab initio, is in force in Pennsylvania, with all its strictness and severity: Kerr v. Sharp, 14 S. & R. 402. The eviction of the tenant by his landlords was a trespass which both suspended the running of rent and nullified the proceedings to distrain ab initio: Kessler v. McConachy, 1 R. 435; Richards v. Mc-Grath, 100 Pa. 399. And there can be no doubt of the correctness of the finding that there was an eviction. The acts of the landlords show their intention to evict, and such intention is conclusively presumed when by wrongful acts the tenant is deprived of the beneficial enjoyment of the premises: Skaley v. Shute, 132 Mass. 367. To forbid a sub-tenant to pay rent to his landlord is an eviction: Leadbeater v. Roth, 25 Ill. 480.

2. The act of the landlords in impounding the distress on the premises for more than five days without the tenant's consent, was clearly illegal and vitiated the whole proceeding: Woglam v. Cowperthwaite, 2 Dall. 68; McKinney v. Reader, 6 W. 34. Under the act of March 21, 1772, 1 Sm. L. 370, the landlord has no discretion as to the time of sale, but must sell as soon as the directions contained in the act will permit, and if he postpone the sale he will become a trespasser: Quinn v. Wallace, 6 Wh. 452. The courts have no power to dispense with any of the terms imposed by the statute upon the right to sell: Davis v. Davis, 128 Pa. 100. If there can be circumstances justifying a postponement, it is incumbent on the defendants to show that they existed in this case, as the usual presumption of regularity, which applies to legal proceedings, is not applicable here: Murphy v. Chase, 103 Pa. 260. Instead of complaining that the damages are excessive, the defendants should congratulate themselves that they are not punitive.

OPINION, MR. JUSTICE GREEN:

We are unable to agree with the learned referee in his conclusion that the postponement of the sale of the plaintiff's goods from the 24th to the 31st of August constituted the defendants trespassers ab initio. The language of the act of 1772, § 1, 1 Sm. L. 370, directing the sale of the distress, is as follows: "And after such appraisement, shall or may, after six days' public notice, lawfully sell the goods and chattels so distrained for the best price that can be gotten for the same," etc. The referee held that the landlord had no discretion to sell after the

expiration of the six days' notice, except by the consent of the tenant. A decision of this court, however, in Ricketts v. Unangst, 15 Pa. 90, to the effect that if there was only one bidder at the sale it would be the duty of the constable to adjourn the sale, induced the referee to say that it is possible that the landlord would be justified in postponing the sale if there were only one bidder present. We said in that case much more than this, to wit: "But the officer ought not to offer the property before an attendance so thin. It would be plainly his duty to adjourn the bidding to another time; and, if he did not, the inference of collusion with the bidder would be so strong that the least spark of evidence would invalidate the sale." Now, this power of adjournment is not put, in the opinion in that case, as an exceptional power justified only by the necessities of the case, but as a clearly existing general power which it would be the plain duty of the officer to exercise in the circumstances stated.

Nor do we see anything in the words of the act of 1772 in conflict with this view. The duty to sell the distress is imperative, and it must be "after six days' public notice," but nothing in the act declares that the sale can take place only on that one day. Many causes may transpire for rendering a sale undesirable, in the interest of the tenant, as also in the interest of the landlord, on the day fixed by the notice. The sudden and severe illness of either the tenant or the landlord, or the death of either party, or the pendency of negotiations, or the occurrence of fire in the building where the distress is impounded at the time of the sale, or the non-attendance of bidders, or very great inadequacy of bids; in short, many quite unforeseen events may readily occur which would make an adjournment quite necessary. The act simply requires a notice of at least six days before making the sale. It is therefore indispensable that a public notice of that length be given, but beyond that nothing is required by the act as a prerequisite to a perfect sale. A power of adjournment is incident to a power to sell, unless an adjournment is prohibited by express words or necessary implication, but there is nothing of that kind in this act. A general power to sell is given, accompanied with no restriction except that six days' notice must be given. We cannot impose any other restriction except

Opinion of the Court.

by exercising legislative power, which of course we cannot do. In this case, an adjournment of seven days took place, when the sale was made. That was not an unreasonable delay, and we certainly cannot see how it could convert a lawful distress into a trespass. There is no authority for such a proposition, nor any recognized principle, derived from a reading of the act of 1772 or from any other source, which requires such a ruling. The learned referee thought the cause of adjournment should appear affirmatively by testimony, otherwise the whole proceeding was invalidated. That might be so if a statutory duty to sell on a certain fixed day were established, but in the absence of such a prerequisite to the validity of the sale, an inference of invalidity does not arise merely because of a short and not unreasonable adjournment. The referee misconceived the decision in Quinn v. Wallace, 6 Wh. 452, in supposing that it declared a sale void if made after the expiration of the six days' notice, as that question did not arise.

We cannot agree that the act of the landlord in taking possession of the premises and impounding the distress thereon was an eviction. The evidence was very clear that, after the warrant was in the officer's hands, the landlord and tenant agreed that the latter might remain and carry on his business, upon his undertaking to pay fifteen dollars per day on account of arrearages of rent. He remained a short time, but did not keep his agreement; and it was not until this arrangement had proved to be a failure that the landlord proceeded with his distress. He then impounded the distress which remained on the premises and proceeded to sell it. The referee finds that there was nothing irregular up to this time, August 18th, the tenant having consented not only to the delay but to the acts of the landlord done prior to the 18th. He also finds that the impounding of the goods on the premises from the time of the levy to the time of the sale was not unlawful. But he finds that in demanding the keys of the tenant and expelling the tenant from the premises, the landlord was guilty of an eviction and became a trespasser ab initio. So far as impounding the goods on the premises is concerned, there can be no doubt that, by the long-settled law of this commonwealth, the landlord has the right to do so, and to take exclusive possession of that part of the premises in which the distress is impounded. It

was so held in Woglam v. Cowperthwaite, 2 Dall. 68, and it was decided that notwithstanding the right to impound on the premises was omitted from our act of 1772, it was the landlord's right at common law, and by long usage the practice had prevailed both before and after the passage of the act, and, further, that the right to impound on the premises continued at least during the five days allowed for the tenant to replevy.

In McKinney v. Reader, 6 W. 34, it appears from the statement of facts in the opinion of the court, that the landlord had impounded the goods distrained, by locking them up in the bar-room, keeping the key himself, and had kept possession of the bar-room for six or eight days, and the court below had charged that this was illegal, unless it was done by consent of the plaintiff's wife. Mr. Justice KENNEDY, in the course of a very elaborate opinion, showed that the charge of the court below on this subject was erroneous, and that the course pursued by the landlord was in accord with judicial opinion both in England and in this state. In both the foregoing cases, it was held that if the landlord was a trespasser at all, for having kept the goods on the premises for eight days, he would be a trespasser only for the three days' excess beyond five days, and the distress was therefore not invalidated from the beginning. In Jackson & Gross on Landlord and Tenant, at § 1104, the authorities are collected, and it is shown that the goods may remain impounded on the premises for a reasonable time after the expiration of the five days, and that in all ordinary cases this will be until the day of sale in due course.

The mere impounding of goods on the premises, until the day of sale, and the landlord's taking them into his exclusive possession under lock and key, is not of itself unlawful and will not necessarily invalidate the distress from its inception. In the present case, the portion of the premises occupied by the plaintiff was a bar-room, where he conducted the business of a retail liquor seller. The rest of the premises he had sublet to another tenant. The property distrained consisted of the bar fixtures, furniture, shelves, and stock of liquor and cigars and other personal property on the premises occupied as a bar-room. Of course it was much more to the interest of the tenant that such property as this should remain in the room than to remove it therefrom; and, as this was the only

room the tenant occupied, an exclusive possession thereof could not be taken by the landlord except in the way in which it was done. We cannot see therefore that the landlord became a trespasser ab initio, by exercising his lawful right to exclusive possession of the distress between the levy and the sale.

But we are not satisfied with the finding of facts by the referee on this subject. Lewis F. List, the constable who made the distraint, testified to the arrangement made with the tenant, by which the latter was to remain on the premises and go on with the business by paying over the receipts of the daily sales, and the efforts the tenant was making to raise money or to sell out to others, all of which proved unsuccessful. This continued from the 10th to the 18th of August. He says : "The receipts were only—one day it was $5, and the next day $4, and the next day $4; there were $13 in four days' receipts, which he was credited for. Then, after that I was ordered to see him, and to state that it would be better for him to save the watchman's expenses, and to close the place and give me the key, as the result was unsatisfactory, the amount of the receipts from the days' sales. He said, 'If you want the keys you can have the keys and close up,' and showed me the key to the front door and the key to the back door. I finally closed the place up, and took the watchman off, and saved the watchman's expense." The referee makes no mention of this testimony, and gives no reason why it should be rejected. The witness was disinterested, and he was not contradicted. The plaintiff gave a somewhat different version of the conversation, but admitted that he gave up the keys and left the place without objection. It is true, he says, he supposed he had to give them up, because it was the constable, but he does not say that he gave them up under compulsion, nor does he contradict in any substantial respect the version given by the constable. As a matter of course, if the constable's account is correct, his act of taking possession was done with the knowledge and consent of the tenant. The knowledge the tenant admits, and the consent he does not deny. We do not rest the decision of this cause upon this one matter, but, we think, upon the plain import of the undisputed testimony, that there was no such satisfactory proof of an eviction as to warrant the finding that

there was a clear eviction, by expelling the tenant from the premises, demanding and receiving the keys, and locking the place up. The landlord, in the exercise of his right to impound the distress on the premises, was entitled to demand and receive the keys, and to lock the place up until the sale, and he cannot be convicted of a trespass ab initio for doing what the law authorized.

The referee also found that the action of the defendant in visiting the Nonantum Worsted Co. upon the demised premises, and cautioning them not to pay any more rent to the plaintiff, and offering to execute a new lease for thàt portion of the premises, combined with locking up the bar-room and expelling the tenant, constituted an eviction. It is true he finds that this eviction would suspend the rent for the month of August, which is not a matter of much account, as he also found that the rent due could not be defalked from the damages sustained by the plaintiff. We do not agree that the conversation with the officers of the Nonantum company about a new lease, and the notiĉe to pay no more rent to the plaintiff, would have any effect upon the legality of the distress, and certainly would not convert the landlord into a trespasser ab initio.

We think the damages allowed by the referee were quite excessive. At the very time the distress proceedings were going on, two executions were in the hands of the sheriff against the plaintiff, and immediately after the constable's sale the sheriff made sale of the remaining assets, including the plaintiff's interest in the lease, which was bought by the defendants. This was on September 9th, and terminated any interest of the plaintiff in the premises. We cannot tell from the report of the referee what he allowed for loss of business, but as he had found that the value of the property sold was $900.23, some inference would arise that the difference between that sum and the amount of the award, $1,650.23, would represent the amount allowed for loss of business. As this period was only from August 18th to September 10th, the finding of such a sum would be altogether out of reason. But it is not a matter of much moment, as we do not consider there was enough in the case to constitute the landlord a trespasser, or to invalidate the distress. As this leaves nothing upon which to found an award

Statement of Facts.

of damages, it follows that the judgment must be reversed without a procedendo.

Judgment reversed.